UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

|  |  |  |
|---|---|---|
| MATTHEW CONNOLLY, | ) | Civil Action No. |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
|  | ) | **COMPLAINT** |
| vs. | ) |  |
|  | ) | JURY TRIAL DEMANDED |
|  | ) |  |
| DEUTSCHE BANK AG, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff Matthew Connolly, by and through his undersigned counsel, alleges against defendant Deutsche Bank AG ("Deutsche Bank") as follows:

**Nature of the Action**

1.     In January 2022, after a legal fight spanning a decade, Matthew Connolly, a former trader at Deutsche Bank AG, was exonerated by the Second Circuit of any wrongdoing in the criminal case brought against him related to LIBOR pricing.  The Second Circuit found that none of Mr. Connolly's actions constituted a crime - in other words, Mr. Connolly was actually innocent of any wrongdoing. This follows findings from Judge McMahan in the District Court that of all the individuals at Deutsche Bank involved in any way in LIBOR pricing, Mr. Connolly "was barely a player at all," was "the least culpable person I have heard about," and that what "was going on was no secret, and was – from all the evidence I have seen and heard – encouraged, if not orchestrated, by senior officials at the bank for the benefit of the bank."  (16-CR-370, Oct. 24, 2019 Transcript 38:23-39:01; 92:16-93:01)

2.      Mr. Connolly comes from a modest background.  He began his career on Wall Street as a file clerk at JP Morgan and worked his way up to head the Derivatives Trading desk at Deutsche Bank in New York.  He left the bank in 2008 with an unblemished record.  When the government began investigating LIBOR pricing several years later, the senior executives of Deutsche Bank, who had been overwhelmingly more involved in LIBOR pricing than Mr. Connolly and, in fact, had orchestrated it, identified their perfect fall guy and hand-delivered him to the government wrapped up in a bow:  Matthew Connolly.

3.      Mathew Connolly brings this action for malicious prosecution based on Deutsche Bank's intentional conduct and material misstatements to the Department of Justice ("DOJ"), and the perjured testimony by a Deutsche Bank employee to a jury in the District Court, in order to have Connolly prosecuted and convicted to protect senior executives at the bank.

4.       Deutsche Bank knew its statements and material omissions regarding Connolly were false and misleading when made, and the DOJ relied on those false statements and omissions in its investigation, in obtaining a federal criminal indictment of Connolly without probable cause and continuing its prosecution of Connolly through trial and an appeal.

5.      At all times, Deutsche Bank knew that its C-Suite and senior executives had directed Deutsche Bank's efforts to affect the LIBOR rate.  In order to protect itself and its elite upper-echelon, Deutsche Bank and its lawyers convinced the DOJ to instead pursue, indict, scapegoat and prosecute Connolly who: (a) had not been employed by Deutsche Bank since 2008, eight years before his indictment; (b) was much lower in the organizational structure; (c) had virtually nothing to do with LIBOR; and (d) was not a member of the privileged club of Deutsche Bank executives worthy of protection.  In other words, of course Deutsche Bank targeted Matthew Connolly.  He was the perfect fall guy.

6.     Connolly's ensuing prosecution followed a well-trod and corrupt path. The government begins an investigation of a large institution, here Deutsche Bank, for alleged wrongdoing.  The conduct at issue – whether wrongful or not – was known to, approved and authorized by senior management of the institution (who, in fact, also encouraged and directed the conduct here).  The institution and its senior management hire a prominent law firm, here Paul, Weiss, Rifkind, Wharton & Garrison LLP, and pay that firm millions (here, tens of millions) of dollars to conduct an "independent" investigation.  The government tacitly or openly approves of this (or even requests it), effectively outsourcing its investigation to the law firm, which becomes a quasi-deputized arm of the government.  As a thank you, the government gives the institution credit for cooperating, reducing the penalties imposed on the institution.

7.     However, the results of that investigation are preordained.  It is a chronicle of a story foretold.  The law firm, doing its job to protect the institution and its senior management, glosses over, obscures and erases from the record senior management's conduct and instead targets a low-level scapegoat, here Connolly.

8.     Connolly, who was barely involved with LIBOR and who did not gain personally from any rate submission, is handed to the government as a sacrificial lamb.  In exchange the government fines the institution at a discount and the kabuki dance concludes.

9.     Although this story may be routine, and may be well known to many in the legal community, it does not make it any less shameful.  Deutsche Bank's conduct concerning its LIBOR rate submissions was known to, approved, authorized and directed by the most senior Deutsche Bank officers.  However, instead of senior management owning their conduct and knowledge, and instead of Paul Weiss doing an honest investigation and drawing the clear conclusions about senior

management's role, Deutsche Bank and Paul Weiss blamed and framed Connolly for a crime he did not commit.

10.     This is a story that has been told many times.  What makes this case stand-out is that Deutsche Bank took the further step of sending a bank employee to testify at Connolly's trial, and this bank employee knowingly perjured himself in front of the District Court at Deutsche Bank's instruction.

11.     Deutsche Bank's efforts were temporarily successful. Not a single person from its senior management was charged with any crime. Because of Deutsche Bank's cooperation with the government (which included handing over Connolly as a scapegoat), the government gave Deutsche Bank a $750,000,000 credit on an ultimate fine of $2.5 billion.  A large amount without question, but one that was very manageable for an institution of Deutsche Bank's size and which was paid by innocent shareholders, not senior management.

12.     Connolly had his life ruined.  In 2016, eight years after leaving Deutsche Bank, he was indicted in the Southern District of New York based on information provided by Deutsche Bank and Paul Weiss.  He fought through a trial where he was convicted of wire fraud and conspiracy to commit wire and bank fraud.  He fought through an appeal and was ultimately exonerated in 2022, when the Second Circuit overturned his conviction, finding that the manner in which banks reported LIBOR rates, the alleged misconduct, was not illegal.

13.     Connolly has been unable to work in his profession since 2016.  He has endured a criminal trial, the loss of free movement, the surrender of his passport, and the destruction of his personal and professional reputation.  It has affected his health, his children and his wife.

14.     Deutsche Bank's decision to scapegoat Connolly to shield its senior management was shameful, wrong and morally unconscionable.  The law provides a remedy.

4

15.     Connolly seeks redress for Deutsche Bank's actions.  He seeks a sum large enough, in excess of $150 million, to compensate him for his economic losses and the torment he and his family have suffered, including damage to his reputation and to punish Deutsche Bank for its role in directing the destruction of his life.

## Parties

16.     Connolly is an individual residing in New Jersey.

17.     Deutsche Bank is a multinational banking and financial services corporation organized and existing under the laws of Germany.  Deutsche Bank is headquartered in Frankfurt, Germany and maintains a United States regional head office at 1 Columbus Circle, New York, NY 10019.

## Jurisdiction and Venue

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and/or 1332(a)(2) because complete diversity of citizenship exists between the parties and the matter in controversy exceeds $75,000 exclusive of interest and costs.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in this district.

## Background

**Connolly's Work History at Deutsche Bank**

20.     Mathew Connolly is from New Brunswick, New Jersey.  He grew up in a family with eight brothers and sisters. He met his wife, Beth, while attending college at Moravian University in Pennsylvania.  They were married 32 years ago at a wedding held in a local firehouse and have raised their two children in New Jersey.  Connolly started his career on Wall Street in 1987 as a file clerk at JP Morgan.  He moved to Deutsche Bank in 1995 with his former boss from

JP Morgan and worked on Deutsche Bank's Commercial Paper Desk. He eventually become the head of that desk and then became a trader on the Government Treasury Desk before transferring to the Pool Trading Desk in 1999.

21.     All Deutsche Bank cash assets and liabilities flow through the Pool Trading Desk. In 2000, Connolly became the head of the Pool Trading Desk in New York. In that position, he managed the financing of Deutsche Bank's dollar balance sheet, as well as the flows of money from London. Connolly's primary role was to lend Deutsche Bank's money internally to other desks which needed financing for their deals or trades; he would then go to the market to finance those internal loans.

22.     In 2005, at Deutsche Bank's request, and after previously turning down the position, Connolly took over as head of the Derivatives Desk in New York.

23.     Connolly left Deutsche Bank in March 2008, before investigations into LIBOR began. During his approximately thirteen years at Deutsche Bank, Connolly had an unblemished record with no disciplinary complaints against him.

**LIBOR**

24.     "LIBOR" stands for London Interbank Offered Rate. It is a benchmark interest rate at which major global banks lend to each other in the international interbank market for short term loans.[1] LIBOR is based on five currencies: the US dollar, the Euro, the British pound, the Japanese Yen, and the Swiss franc.

25.     The British Bankers Association ("BBA") published LIBOR rates daily for fifteen different periods (*e.g.,* overnight, one week, one month, three months, etc.).

---

[1] LIBOR will be phased out of use by June 30, 2023. The discussion here refers to LIBOR as it existed during the relevant period.

26.     To determine LIBOR rates, BBA accepted daily submissions from sixteen "panel banks" that served the roles of "LIBOR submitters," pursuant to rules set out in the "BBA LIBOR Instruction."  Deutsche Bank served as one of the sixteen panel banks, and appointed an employee in London to serve as the LIBOR submitter.

27.     Each LIBOR submitter made an estimate (to at least two decimal places) of what it believed their bank would have to pay to borrow cash from another bank.  The sixteen submissions were then averaged – with the four highest and four lowest submissions being dropped in a process known as "trimming" – and published by the BBA daily as the LIBOR rates for the fifteen periods.

28.     Because banks have billions of dollars of investments, loans, and trading positions that are impacted by LIBOR, banks could make or lose money depending on how LIBOR moved (up or down, and by mere hundredths of a percentage point).

29.     The trimming process was designed to prevent any one bank from intentionally moving the rate to gain an advantage for itself.  That is, the only way banks would effectively be able to move the rate would be to engage in interbank collusion, a practice that was forbidden by the BBA LIBOR Instruction.

30.     By design, LIBOR could not be affected by a single submission.

**Alleged LIBOR-Rigging**

31.     Traders who knew a bank's trading positions could determine which way the bank was "facing"—whether it would be economically advantageous to the bank to have LIBOR increase or decrease.

32.     It was known that traders at various banks would sometimes make requests to the LIBOR submitter at their bank to put in "high" or "low" LIBOR estimates.  If the LIBOR submitter

accepted the request, the submitter might adjust the submission up or down (*e.g.* by a hundredth of a percentage point).

33.    In various criminal LIBOR-rigging trials brought by the Department of Justice since 2015, the government presented those submissions as an illegal attempt to improperly skew the LIBOR average in favor of the submitter's bank (and various traders' own personal interests) at the expense of others in the market.

34.    In those trials, the defendants, among other arguments, put forth the defense that there was nothing illegal about submitting a rate that accounted for the bank's commercial interest because, consistent with the BBA LIBOR Instruction, the submissions were within a narrow range of acceptable and accurate rates from which to choose.  Many of the trials ended in acquittals on that basis.  *See*, *e.g.*, https://www.bbc.com/news/business-39225858.

**Connolly's Connection to LIBOR and Deutsche Bank's Instructions and Policy Regarding LIBOR Submissions**

35.    In or around 2001, while he was the head of the Pool Trading Desk in New York for Deutsche Bank, Connolly concluded that the LIBOR rate did not accurately reflect what was going on in the market.  He found there was frequently a significant discrepancy between the actual rates being used in daily transactions and the "made up" LIBOR rate.  Connolly himself did not trade any products tied to LIBOR; his primary responsibilities were funding Deutsche Bank and running the cash desk.  He therefore chose to use other benchmarks for his trades (*e.g.*, the Overnight Index Swap ("OIS")—a rate calculated based on real transactions as opposed to the conjectures of sixteen banks).  He also advised traders on his desk *not* to rely on LIBOR, and to instead make trades against other benchmarks.

36.    At the same time, the Deutsche Bank Derivatives Desk – which Connolly did not then run – was required to use LIBOR when customers asked for markets in LIBOR.

37.     In or around 2004, Connolly's boss, who was based in London, told him that Deutsche Bank's LIBOR risk should be communicated to Deutsche Bank's LIBOR submitter. That is, although Connolly did not trade LIBOR and did not manage the derivatives desk, his London based boss directed him to advise traders on the Derivatives Desk to assess Deutsche Bank's LIBOR position (whether it would be advantageous to Deutsche Bank's commercial positions to have the LIBOR rate increase or decrease) and to communicate that to Deutsche Bank's LIBOR submitters in London.

38.     Connolly did not believe this was an improper request since it was well-established that LIBOR submissions could fall within a range.  Moreover, the trimming process avoided a situation where a single bank could influence the rates.

39.     Connolly subsequently became head of the Derivatives Desk.

40.     As would later become clear at his trial, other Deutsche Bank employees, including Tim Parietti, a Derivatives Desk trader and the primary person in New York responsible for LIBOR, along with Deutsche Bank's LIBOR submitters, all understood that the making and receiving of requests to adjust the rate up or down was permitted by the BBA LIBOR Instruction, and was not only acceptable to – but was specifically directed by – Deutsche Bank senior management.

**Government Investigation into Deutsche Bank**

41.     The *Wall Street Journal* did an exposé on LIBOR in April 2008.  The article warned of concerns that LIBOR was "becoming unreliable."  It noted that "bankers and other market participants have quietly expressed concerns to the British Banking Authority, which oversees Libor, about whether banks are reporting rates that reflect their true borrowing costs . . . ." (https://www.wsj.com/articles/SB120831164167818299).

42.    In 2010, the United States Securities and Exchange Commission ("SEC") opened an investigation into Deutsche Bank's potential role in connection with LIBOR manipulation.

43.    On April 19, 2010, the Commodity Futures Trading Commission ("CFTC") sent Deutsche Bank a letter advising that the CFTC's Division of Enforcement was investigating whether LIBOR panel banks' submissions were false or misleading.  The CFTC stated that it expected Deutsche Bank to cooperate fully with the investigation, including Deutsche Bank's retention of outside counsel to conduct an internal investigation:

> [T]he Division requests that Deutsche Bank . . . voluntarily conduct by **external** counsel a full review of Deutsche Bank's U.S. Dollar LIBOR reporting for the relevant time period, and report on an ongoing basis the results of that review to the Division, with the review to be completed by no later than September 1, 2010.

(Original emphasis.) The initial review period was from 2007 to 2008, but it was subsequently expanded to include 2005 to 2012.

44.    Deutsche Bank hired Paul Weiss to handle its internal investigation.

45.    In a CFTC letter dated July 14, 2010, the CFTC detailed that it had multiple telephone conversations with Paul Weiss to coordinate the first stage of the internal investigation, including Paul Weiss' agreement to take certain specific investigative actions, and stated the CFTC's expectation that Paul Weiss provide weekly updates concerning the progress of the investigation, including the simultaneous productions of responsive documents and information uncovered in the internal investigation.

46.    In a January 21, 2015 Paul Weiss document known as the "White Paper," Paul Weiss detailed its investigation findings and summarized the many ways Deutsche Bank and Paul Weiss assisted the government, including parsing the enormous amount of information obtained and directing the government to Deutsche Bank's preferred targets.

47.     The White Paper stated that "these volumes of data and documents would be virtually impossible to navigate without direction," and thus "the Bank promptly sought to point the DOJ to the information it would find most relevant."  Further, "[t]he Bank took extraordinary efforts to distinguish between information that was merely responsive to the DOJ's requests and information that was 'notable,' in that it contained evidence or information that the Bank believed would be of particular interest."

48.     The White Paper concluded that Deutsche Bank and Paul Weiss expected the government to decide who to charge and prosecute based on the documents Deutsche Bank highlighted for the government:

> We believe that these efforts . . . have provided the DOJ with a full and complete picture of the facts. Indeed, **we expect that much (if not most) of the information that will ultimately be used in making charging decisions . . . will have come from the Bank's identification of notable communications and its having brought those communications to the DOJ's attention**. (Emphasis added.)

49.     As later determined by the Chief Judge of the Southern District of New York, Colleen McMahon, "[i]t is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that Paul Weiss provided—illuminating just how the Government should 'investigate' the case against certain Deutsche Bank employees." Further, Judge McMahon wrote that Paul Weiss "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect."  In sum, "[t]he only conclusion one can draw . . . is that, rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to Deutsche Bank—the original target of that investigation—and then built its own 'investigation' into specific employees," including Connolly.

**Deutsche Bank's Settlement with the Government**

50.    From 2010 to 2015, Deutsche Bank paid Paul Weiss and a UK firm, Slaughter and May, over $100 million for the LIBOR investigation, which included reviewing 158 million electronic documents, listening to 850,00 audio files, conducting nearly 200 interviews of more than fifty bank employees, and engaging in hundreds of communications with the government. For more than a year leading up to the conclusion of the investigation, Paul Weiss held weekly calls with the DOJ, CFTC and FBI.

51.    The enormous effort and expense of the investigation benefitted Deutsche Bank many times over when it settled with the government.  As detailed in Deutsche Bank's April 23, 2015 Deferred Prosecution Agreement:

> [U]pon being alerted to an investigation by the Department [of Justice] and other regulatory authorities, Deutsche Bank commenced an internal investigation and cooperated with authorities, including disclosing much of the misconduct described in the Information and Statement of Facts. Deutsche Bank collected, analyzed, and organized voluminous evidence, data, and information, and did so in a way that saved the Department significant resources by identifying certain documents and segments of audio files and providing translations for certain documents where applicable. Deutsche Bank also assisted and facilitated the Department's interviews of current and former employees, including foreign employees and Deutsche Bank communicated with and updated the Department with increasing frequency as the investigation progressed.

52.    In exchange for Deutsche Bank's comprehensive cooperation, the government granted Deutsche Bank a significant discount on the combined $2.5 billion in fines Deutsche Bank agreed to pay as part of settlements entered in April 2015 (which would have been $3.25 billion without the cooperation discount). In other words, Deutsche Bank's cooperation was worth $750,000,000.

53.     As part of the settlement, no member of Deutsche Bank's protected class of senior management was fined, prosecuted or deregistered.  Although senior management's role in the alleged LIBOR-rigging scheme was well known to the government, Deutsche Bank also successfully negotiated as part of the Deferred Prosecution Agreement that there would be no admission of wrongdoing by senior management.

54.     Actual evidence of this type of trade - where senior management is protected from government prosecution in return for a scapegoat plus a large fine paid by the Company (i.e. by innocent shareholders) - is rarely obtained.  Here we know what happened.

55.     The DOJ originally prepared a draft "Statement of Facts" that was to be incorporated into the Deferred Prosecution Agreement. The DOJ's draft Statement of Facts included a section titled, "DB Management Awareness of the Conduct, Tolerance of the Conflicts of Interest and Promotion of Culpable Individuals," which stated that "[c]ertain DB managers and senior managers were aware of requests by DB derivatives traders to submit Libor and Euribor rates that benefitted trading positions" and that "DB senior managers and managers . . . recklessly disregarded significant conflicts of interests [including] encouraging open communications between traders and submitters and seating many of them together . . . ."

56.     The final Statement of Facts – issued after the DOJ cut its final deal with Deutsche Bank – dramatically downplayed these allegations.  The section title was drastically toned down to "DB Management" with no mention of their awareness or tolerance of the conduct.  And only a single senior manager – not multiple – was identified as having overseen the LIBOR submissions, while references to desk level managers and a mid-level manager were retained. The phrase "recklessly disregarded" was also removed.

57.     After successfully bargaining away any acknowledgement of culpability by its most senior leaders, Deutsche Bank agreed in the final Statement of Facts that its LIBOR "rate submissions were false and misleading" and that "in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct." Deutsche Bank further "acknowledge[d] that the wrongful acts taken by the participating employees in furtherance of the misconduct . . . were within the scope of their employment at [Deutsche Bank]."

58.     Deutsche Bank agreed in the Deferred Prosecution Agreement, and affirmed to be "true and accurate," that Connolly was one of the employees who engaged in this supposed misconduct.

**Deutsche Bank Scapegoats Connolly**

59.     In September 2015, then-Attorney General Sally Yates announced in what came to be known as the "Yates Memo" that the government would increase its focus on the prosecution of individuals for financial crimes.

60.     The Yates Memo established a new DOJ policy focusing on the investigation of individuals and creating new rules under which the DOJ would afford companies credit for cooperation with an investigation. The Yates Memo required that companies identify **all** individuals involved in **any** aspect of alleged misconduct, regardless of their status or seniority, for the company to receive **any** credit for its cooperation with the government. The threat of withheld cooperation credit on an all-or-nothing basis, plus the requirement that all potentially involved individuals be identified before a settlement could be finalized, gave the government significant leverage to demand that companies point out individuals.  This, of course, created incentive for companies to protect senior management and identify scapegoats.

61.    It is widely acknowledged that the Yates Memo effectively caused banks and other companies being investigated to become deputized arms of the government. Sharon Oded, *Coughing Up Executives or Rolling the Dice?: Individual Accountability for Corporate Corruption*, 35 Yale L. & Pol'y Rev. 49 (2016).

62.    Consistent with the Yates Memo, there was a clear expectation on the part of the DOJ that Deutsche Bank would provide the names of individual employees whom Deutsche Bank and Paul Weiss believed should or could be prosecuted. Deutsche Bank therefore could – and did – influence the evidence the prosecution considered.

63.    The evidence in Deutsche Bank's possession demonstrated that executives far senior to Connolly and reaching up into the C-Suite, including Deutsche Bank's Global Chief Executive and Co-Chairman Anshu Jain, its Global Head of Rates Alan Clote, and its Global Head of Finance David Nicholls, actually influenced the bank's reporting of LIBOR rates by encouraging derivatives traders and LIBOR submitters to share information about trading positions.  Such senior managers were even responsible for the physical restructuring of the bank's floor plan so that the Derivative Desk and the Pool Trading Desk were closer to each other so they could more easily share their risk positions, including on LIBOR.

64.    But as Connolly would learn, an intentional decision was made by Deutsche Bank to insulate senior persons from liability. Rather than direct the DOJ to information regarding the involvement of its senior executives, Deutsche Bank and Paul Weiss instead focused attention on lower-level traders who were following the policies and practices that had been dictated by those senior executives.

65.    Fewer than 5 of the approximately 100 people trading LIBOR-based derivatives worldwide for Deutsche Bank were based in New York.   The two who were subjected to focus

were the lowest-level people in New York who had any involvement with LIBOR: Parietti, Deutsche Bank's LIBOR trader for the New York office, and Connolly, who was the head of Parietti's desk but did not himself trade LIBOR-based derivatives.

66.     When Deutsche Bank first approached Connolly regarding LIBOR issues in February 2013 – five years after he had left Deutsche Bank – it was to inform him that Deutsche Bank had given his emails to the FBI, which was among the government agencies looking into the matter.  Connolly was not concerned; he knew that he taken little action regarding LIBOR, and that any action he had taken was consistent with Deutsche Bank policies and instructions.

67.     The FBI subsequently sought to interview Connolly.  Deutsche Bank offered to pay Connolly's legal fees.  Connolly willingly participated in a seven plus hour interview with more than twenty people present from various government agencies, including the FBI, the DOJ, the SEC, CFTC, and others.

68.     During his interview, Connolly repeated the truth: that Deutsche Bank senior management had directed both Connolly and Parietti to consider Deutsche Bank's trading positions in connection with Deutsche Bank's LIBOR submissions.

69.     Connolly left the interview unconcerned since: (a) his LIBOR involvement was extremely limited; and (b) any involvement he had and action he took in connection with LIBOR had been directed by Deutsche Bank.

70.     In late April 2016 – eight years after Connolly had left Deutsche Bank – the DOJ advised Connolly's lawyer that Connolly was a target of its investigation of individuals from Deutsche Bank connected to alleged LIBOR rigging activity.  Both Connolly and his attorney were stunned.

71.     On May 31, 2016, the DOJ indicted Connolly in the Southern District of New York. The indictment was based on Deutsche Bank's (and Paul Weiss') intentionally skewed investigation and knowingly false presentation and omission of information to the government. Deutsche Bank deliberately obscured the actions of its senior executives and walked the government to Connolly, who in Deutsche Bank's eyes was the ideal fall guy because he had never been in senior management, was not a member of the "club", had long since left Deutsche Bank and, having been a desk supervisor, gave the veneer of holding someone senior accountable (despite being far closer to the bottom than the top). Although Deutsche Bank knew that Connolly had done nothing wrong, it offered him up to the government as a scapegoat.

72.     Gavin Black, a Deutsche Bank employee in London, was indicted along with Connolly.  Mr. Black, like Mr. Connolly, was far from being a senior executive at Deutsche Bank.

73.     Connolly was arrested and arraigned on June 1, 2016.

74.     Connolly was informed that the charges stemmed from the investigation that the DOJ had conducted.  What Connolly did not understand at the time was that the DOJ's investigation was premised almost entirely on information fed to them by Deutsche Bank. However, this was just the beginning of Deutsche Bank's scheme to frame Connolly.

**SDNY Proceeding and the Lack of Evidence Against Connolly**

75.     On October 18, 2019, Connolly and Black's trial began with Judge McMahon presiding.

76.     Notwithstanding that they were being charged with conspiracy, Connolly and Black had never met, spoken or otherwise communicated before the trial.

77.     The DOJ claimed that Connolly directed his subordinates to submit false LIBOR rates to advance Deutsche Bank traders' interests.

78.     In her opening statement at trial, the prosecutor told the jury that "[i]n [Connolly and Black's] quest to make every extra dollar they could . . . they cheated by rigging the LIBOR interest rate."

79.     No evidence was submitted during trial to indicate that Connolly's compensation increased based on any activity related to LIBOR.

80.     The entirety of the evidence against Connolly focused on **four** emails, all of which were more than twelve years old.  Connolly had sent three, and had been copied on one.

81.     The first email, dated November 23, 2005, was sent from Connolly to Deutsche Bank's two LIBOR submitters, Mike Curtler and James King in London.  It stated "OTC request 3-month LIBOR as high as possible Thursday and Friday if you see the market higher. Thanks." Connolly understood this request to be consistent with bank policy and the specific direction he had received in 2004 from his boss in London.

82.     The response from King indicated that they had **not** accepted Connolly's recommendation to submit a higher rate:  "Matt, we've gone in relatively neutral as a high 3s doesn't suit London at the moment. Hope that's ok. James."  Connolly responded, "**Doesn't matter to me** . . . May matter to OTC/rates NY . . . we will all find out I guess." (Emphasis added.)

83.     "OTC" stands for "over the counter." Because there is no regulated exchange for derivative trades, those transactions, which are direct between banks, are known as "OTC trades." Connolly did not supervise the OTC desk, so even if money had been made by the OTC desk based on his request, neither Connolly nor his desk would have profited from it.

84.     The second email, dated November 28, 2005, was from Connolly in response to a question from one of the submitters.  Curtler advised, "1 mth over the turn is looking like 26-32 hahaha – anything either way from you guys? We are still short."  Connolly responded,  "Hahahah

never fails. We would prefer it higher. We have about 15 BB 1 mo receives. Thanks. Just asking is very much appreciated . . . ." Curtler responded, "will do like James then – ask, and do the opposite...let us know the days you rec, first fix tom will set the tone."

85.     The third email, dated August 12, 2007, from Connolly to Curtler and King stated, "If possible, we need in NY 1 mo libor as low as possible next few days...tons of pays coming up overall...thanks!"  Review of the LIBOR submissions for that date showed the Deutsche Bank submission was an outlier, and thus was excluded from consideration in the trimming process – meaning it could not have affected that day's LIBOR rates.

86.     The fourth email (on which Connolly was copied) was from Parietti to King in which Parietti requested an adjustment to the rate.  Both Connolly and Parietti understood at the time that such request was proper.

87.     There was no evidence of any telephone calls involving Connolly seeking LIBOR adjustments or colluding with other banks to influence the rates.

88.     King and Curtler testified that in arriving at the daily LIBOR rates they submitted, in addition to using computer-generated "pricers," they would manually "put in various factors" "based on various things" and "added in various spreads to reach the cash prices that we [ ] wanted to use internally."  They would also consider requests received from Deutsche Bank's derivatives traders.  Additionally, they spoke with five interbank cash brokers before settling on Deutsche Bank's submission rates. They understood that all of these factors could rightly be considered under the BBA rules and Deutsche Bank's policies.

89.     King testified that he believed the BBA LIBOR Instruction provided him leeway as to which rate to submit. King further testified that while Connolly occasionally made a request

to change the LIBOR rate, it was to "benefit the trader's position"—not for Connolly's own benefit.

90.    Curtler testified that "there are a range of numbers which could be reasonably used as a correct LIBOR rate," and that Connolly never made a request for a LIBOR submission outside the range of interest rates at which the bank may realistically borrow.

91.    Parietti testified that any requests to tweak LIBOR up or down were consistent with bank policy.

92.    Although the government had publicly announced, based on information from Deutsche Bank, that requests to adjust LIBOR were made by "rogue traders" attempting to manipulate the rate for their own gain, at trial the government did not dispute that such requests for adjustments were consistent with Deutsche Bank's policy.  Indeed, Judge McMahon stated that the evidence demonstrated that it was, in fact, Deutsche Bank's policy.

93.    Much of Connolly's defense relied on the fact that LIBOR submissions could reasonably fall within a range.  In fact, the BBA had publicly acknowledged that there was an acceptable range of LIBOR submissions.

94.    In 2008 – eleven years before the case against Connolly was filed – the Chicago Mercantile Exchange sent a letter to the BBA in response to solicitation by the BBA as to how LIBOR should function.  The letter addressed "the frequent accusation that Contributor Panelists habitually submit false or biased responses to the daily Libor survey," and concluded, "[a] Contributor Panelist who can borrow 'in reasonable market size' at any one of a wide range of offered rates commits no falsehood if she bases her response to the daily Libor survey upon the lowest of these (or the highest, or any other arbitrary selection from among them)."  That is, in

2008, it was acknowledged that there was a range of LIBOR rates which a given submitter could reasonably proffer.

95.     In 2017—two years before the Case against Connolly was filed— John Ewan, the former LIBOR manager at BBA, testified in a UK proceeding that a bank was "perfectly entitled" to ask for a lower rate if it was within a range of interest rates at which the bank might borrow cash.  Mr. Ewan was asked, "[i]f a bank can borrow in reasonable market size at any one of a wide range of offered rates, then it is not false or inconsistent with the definition for the bank to base its response, in other words its submission, on the lowest of those rates?" He responded, "No."  He was further asked, "[o]r the highest one or any other arbitrary selection among them?" and he further responded, "[t]hat's right."

96.     Also in 2017, in the case of *US v. Allen*, 864 F.3d 63, 75 (2017), the Second Circuit found that during the trial, "[t]here was further agreement that, as 'estimates,' LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a 'range' of reasonable LIBOR submissions.

97.     The government never sought information from the BBA prior to Connolly's indictment, and did not call any witnesses or introduce any evidence regarding the BBA's position on this during the trial.

98.     It also failed to inform the court about the Second Circuit's previous findings regarding LIBOR ranges.

**Misconduct by Deutsche Bank and the DOJ at the Trial**

99.     During the trial, a prosecution witness who worked for Deutsche Bank admitted that he had committed perjury twice during the trial at the direction of a Deutsche Bank lawyer and DOJ prosecutor.

100.    The witness, Guy Weston-Edwards, a Deutsche Bank employee in the IT department, had sworn under oath in two affidavits that documents which falsely tied Connolly to portfolios and counterparties that Connolly had no connection to were true and accurate Deutsche Bank business records.

101.    Because Deutsche Bank and the government could not tie Connolly to any specific LIBOR trades, they got creative: they referenced a portfolio of Parietti's (which *did* have LIBOR trades), cut and pasted data from multiple business records into a single spreadsheet, and submitted the spreadsheet as an original Deutsche Bank business record to link Connolly to the trades as Parietti's supervisor.

102.    Weston-Edwards had advised Deutsche Bank, Deutsche Bank's attorneys, and attorneys from the DOJ that such documents were *not*, in fact, original Deutsche Bank business records, but were created after the fact by an outside research firm; Deutsche Bank and the DOJ nonetheless instructed him to sign the affidavits attesting to such documents being "original records or true and accurate copies of records that . . . were kept in the course of a regularly conducted business activity."

103.    In the courtroom, Weston-Edwards physically pointed to one of the attorneys for the government, Michael Koenig, who had given him the instruction.  He also specifically named Jesse Crew, an in-house attorney for Deutsche Bank, as having directed him to testify that the spreadsheet was an original business record and to certify its authenticity.

104.    Judge McMahon was livid, scolding the prosecutors, "[y]ou should be ashamed of yourselves."  She noted, "I am so upset about this affidavit thing.  I find it appalling," and added that she was "stupefied by everything that's happened here."

105.     Judge McMahon's reference to "everything that's happened here" had to do with the numerous improper actions the DOJ – squarely through Deutsche Bank's assistance – had taken over the course of the trial.

106.     She chastised the prosecution, "if I had ten dollars for every time you ever stood up and said that you misspoke, it's more times in one case than the collective misspeaking of the Department of Justice in all of my 20-year criminal docket."  She added, "I have never had a trial with so many surprises, fiascoes, [and] retractions, it hasn't happened."

107.     As noted above, most of the information the DOJ had presented against Connolly had been given to it by Deutsche Bank.

108.     Judge McMahon found that the DOJ did not conduct any interviews of its own until the witness had "first passed through" Paul Weiss.  Paul Weiss recognized this fact in its White Paper.

109.     The consequences were clear.  As Judge McMahon wrote, "there are profound implications if the Government, as has been suggested elsewhere, is routinely outsourcing its investigations into complex financial matters to the targets of those investigations, who are in a uniquely coercive position vis-à-vis potential targets of criminal activity."

110.     The conclusion seems apparent:  Deutsche Bank told the DOJ to focus on Connolly as a target (which led to his indictment), and did so both to draw attention away from the Deutsche Bank senior executives who – unlike Connolly – had actual responsibility with regard to LIBOR and to help itself in its settlement negotiations with the government.

111.     Deutsche Bank's effort to direct the DOJ *toward* Connolly and *away* from high-level Deutsche Bank executives was a blatant move to distance itself from the LIBOR investigation and to claim it had not countenanced the actions of "rogue traders."

112.    In short, all Connolly had done was send three emails (and be copied on a fourth), which he understood to be fully in line with Deutsche Bank's policies and his superiors' specific instructions.  Yet, Deutsche Bank chose Connolly to serve as the New York fall-guy.

**Connolly's Conviction and Sentencing**

113.    On October 17, 2019, Connolly was convicted of conspiracy to commit wire and bank fraud, in connection with the submission of statements that could affect LIBOR.

114.    The district court's belief in the role Deutsche Bank played in the events at issue, and Connolly's overall lack of culpability, was on full display at Connolly's sentencing hearing.

115.    Judge McMahon stated, "Defendants didn't put anything over on Deutsche Bank . . . . What was going on was no secret, and was – from all the evidence I have seen and heard – encouraged, if not orchestrated, by senior officials at the bank for the benefit of the bank." She added, "I don't believe [Parietti] did what he did because Matt Connolly told him to – and neither did the jury – but I do believe his testimony that senior management at the bank directed this activity.  And Matt Connolly was not part of the senior management at Deutsche Bank."

116.    Judge McMahon continued, "I do think it is fair to say that the government has used Mr. Connolly and Mr. Black, as well as a few other people – none of whom was at the highest levels – as proxy wrongdoers, to make them an example for the wrongdoings of those institutions, Deutsche Bank and Rabobank in this court, and for similar wrongdoing of other unindicted institutions as well."  She explained "I [ ] cannot make Mr. Connolly and Mr. Black scapegoats for the sins of the entire industry."

117.    When it came time to render the sentences, Judge McMahon stated: "Mr. Black . . . you were really a bit player in this.  Mr. Connolly was barely a player at all.  And given what has happened to everybody else in this case, and what has not happened to a lot of people

who aren't in this case – and aren't in other cases – it would be a travesty to sentence Matt Connolly to a term of incarceration. . . . I can't mete out a sentence of imprisonment on Mr. Connolly who truly – I have been through this evidence – is the least culpable person I have heard about. . . . I'm always uncomfortable when I'm asked in any context . . . to sentence the low man on the totem pole while the big guy goes free."

118.    The Court sentenced Connolly to time served and supervised released which included six months of home confinement.  He was also ordered to pay a $100,000 fine.

**Appeal and Acquittal**

119.    Connolly and Black appealed.

120.    In reversing Connolly and Black's convictions, the Second Circuit held that while the BBA LIBOR Instruction prohibited collusion between panel banks, it did not have a similar prohibition against banks making their LIBOR submissions with consideration of the bank's own interest-rate-sensitive derivatives; in short, nothing in the BBA's Instruction prevented a panel bank's LIBOR submitters from receiving or considering intrabank input—such as the input provided by Connolly. Simply put, the Second Circuit found that Connolly's actions were not unlawful and that he had committed no wrongdoing.

121.    On January 27, 2022, the Second Circuit overturned Connolly's conviction and directed the district court to enter a judgment of acquittal.

**First Cause of Action**
**(Malicious Prosecution)**

122.    Connolly repeats and realleges the allegations set forth herein.

123.    Deutsche Bank initiated and continued a criminal proceeding against Connolly, including by making materially false representations and omissions to the DOJ.

124.    Deutsche Bank knew at the time that such representations and omissions were false.

25

125.    Deutsche Bank acted with malice by initiating and continuing the proceeding against Connolly due to the wrong and improper motive of making such false representations and omissions in an effort to limit its own civil, criminal and regulatory liability, and to protect its senior management.

126.    Deutsche Bank had no probable cause to believe that its claims against Connolly would succeed since it knew that its representations were false.  Deutsche Bank was motivated by an improper and self-serving motive in helping to secure Connolly's indictment.

127.    During the trial, Deutsche Bank put forth perjured testimony by a Deutsche Bank employee in a further effort to obtain favor with the government and to secure a conviction of Connolly.

128.    Connolly's conviction, which was based on Deutsche Bank's false representations and omissions, was overturned on appeal, and Connolly was acquitted.

129.    Connolly has suffered significant damages as a result of Deutsche Bank's malicious conduct.

WHEREFORE, Plaintiff prays that this Court grant:

(a) an award of damages to Plaintiff in an amount to be determined by the Court of not less than $150,000,000;

(b) exemplary damages to Plaintiff in an amount to be determined by the Court;

(c) awards of pre- and post- judgment interest in favor of Plaintiff;

(d) an award of attorneys' fees and all other applicable costs of this action to Plaintiff;

(e) punitive damages; and

(f)  such other and further relief as this Court may deem just and proper.

## Jury Demand

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated:  November 17, 2022
New York, New York

/s/ David B. Wechsler
David B. Wechsler, Esq.
Jonathan Harris, Esq.
Julie Withers, Esq
Daniel Grossman, Esq.
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, NY 10005
(212) 397-3370
jon@hs-law.com
dwechsler@hs-law.com
jwithers@hs-law.com
dgrossman@hs-law.com

*Attorneys for Plaintiff Matthew Connolly*
