UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MATTHEW CONNOLLY,                    )    Case No.: 1:22-cv-09811-JMF
                                     )
                    Plaintiff,       )
                                     )
                                     )    **<u>AMENDED COMPLAINT</u>**
        vs.                          )
                                     )    JURY TRIAL DEMANDED
                                     )
DEUTSCHE BANK AG,                    )
                                     )
                    Defendant.       )
                                     )
                                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff Matthew Connolly, by and through his undersigned counsel, alleges against defendant Deutsche Bank AG ("Deutsche Bank") as follows:

**<u>Nature of the Action</u>**

1.      In January 2022, the Second Circuit exonerated Matthew Connolly in the criminal case brought against him related to LIBOR submissions. The Second Circuit found that none of Mr. Connolly's actions constituted a crime – in other words, Mr. Connolly was actually innocent of any wrongdoing. This follows findings from District Court Judge Colleen McMahon that Connolly, a former Deutsche Bank trader, "was barely a player at all" and "the least culpable person I have heard about" out of all the individuals at Deutsche Bank involved in LIBOR submissions, and that "[w]hat was going on was no secret, and was – from all the evidence I have seen and heard – encouraged, if not orchestrated, by senior officials at the bank for the benefit of the bank." *United States v. Connolly*, 16-cr-370-CM, Dkt. No. 457 (Oct. 24, 2019, SDNY) (Tr. 38:24-39:2; 92:20-93:5).

Deleted: Civil Action No.

Deleted: after a legal fight spanning a decade, Matthew Connolly, a former trader at Deutsche Bank AG, was exonerated by …
Deleted: of any wrongdoing
Deleted: pricing
Deleted: -
Deleted: Judge McMahan in the
Deleted: of all the individuals at
Deleted: involved in any way in LIBOR pricing, Mr. Connolly…
Deleted: ," was
Deleted: ,"
Deleted: what "
Deleted: (
Deleted: CR
Deleted: ,
Deleted: Transcript
Deleted: 23
Deleted: 01
Deleted: 16
Deleted: 01)

2.    How did Connolly end up in this position?  This is no ordinary case.  Connolly was the victim of a deliberate effort by his former employer, Deutsche Bank, to steer a Department of Justice ("DOJ") investigation towards him and other lower-level employees and away from the senior executive decision makers.  Deutsche Bank did this to appear to cooperate with the DOJ while driving the investigation to a favorable result for the bank and its high ranking officers.

3.    Mathew Connolly brings this action for malicious prosecution based on Deutsche Bank's calculated conduct, misstatements, and omissions to the DOJ, and the perjured testimony by a Deutsche Bank employee to the jury in the District Court at trial.

4.    Connolly comes from a modest background.  He began his career on Wall Street as a file clerk at JP Morgan and worked his way up to head the Derivatives Trading desk at Deutsche Bank in New York.  He voluntarily left the bank in 2008 with an unblemished record.  When the government began investigating LIBOR submissions several years later, Deutsche Bank senior executives, who had been overwhelmingly more involved in LIBOR submissions than Connolly and who had created, directed, and/or approved of the method for how the bank determined its LIBOR submissions, identified Connolly as the perfect fall guy and hand-delivered him to the government for prosecution.

5.    Deutsche Bank knew what it told, and what it did not tell, the government regarding Connolly was false and misleading and that the DOJ would, and did, rely on that information in its investigation, in obtaining a federal criminal indictment of Connolly based on serious omissions, and in continuing its prosecution of Connolly through trial and appeal.  Deutsche Bank was an engaged partner for and arm of the government throughout, facilitating the investigation and prosecution.

2

Deleted: Mr.
Deleted: pricing
Deleted: the
Deleted: of Deutsche Bank
Deleted: pricing
Deleted: Mr.
Deleted: , in fact,
Deleted: orchestrated it
Deleted: their
Deleted: wrapped up in a bow:  Matthew Connolly
Deleted: Mathew Connolly brings this action for malicious prosecution based on Deutsche Bank's intentional conduct
Deleted: material misstatements to
Deleted: Department of Justice ("DOJ"), and the perjured testimony by a Deutsche Bank employee to a jury in the District Court, in order to have Connolly prosecuted and convicted to protect senior executives at the bank. ¶ Deutsche Bank knew its statements and material omissions
Deleted: were
Deleted: when made,
Deleted: relied on those false statements
Deleted: omissions
Deleted: without probable cause and
Deleted: an

6.      At all times, Deutsche Bank knew that its C-Suite and senior executives had directed Deutsche Bank's LIBOR submission practices and policies.  Mid-level traders, including Connolly, trusted and justifiably relied on that direction and those practices, understanding them to be vetted, legal and in compliance with the law (which Deutsche Bank believed, too).

7.      But when the government began questioning LIBOR's accuracy, Deutsche Bank gave the DOJ an incomplete and false map to protect itself and its elite upper-echelon from scrutiny, encouraging and inducing the DOJ to pursue, indict, scapegoat, and prosecute Connolly who: (a) had not been employed by Deutsche Bank since 2008, eight years before his indictment; (b) was much lower in the organizational structure; (c) had virtually nothing to do with LIBOR submissions; and (d) was not a member of the privileged club of Deutsche Bank executives worthy of protection.

8.      The investigation, indictment, and ensuing prosecution followed a well-trod and corrupt path.  The government begins an investigation of a large institution, here Deutsche Bank, for alleged wrongdoing.  The conduct at issue was known to, and approved and authorized by, senior management (who also directed the conduct here).  The institution and its senior management hire a prominent law firm, here Paul, Weiss, Rifkind, Wharton & Garrison LLP, and pay the firm millions (here, tens of millions) of dollars to conduct an "independent" investigation.  The government tacitly or openly approves of this (or even requests it), effectively outsourcing its investigation to the law firm, which becomes a quasi-deputized arm of the government (knowing that employers can secure the cooperation from current and former employees in ways the government cannot, for example by threatening to clawback previously paid compensation and because employees may not exercise Fifth Amendment rights in a private investigation).  In short, the institution knowingly does the government's bidding, the government relies on the information

3

the employer obtains, and the *quid pro quo* is that the government gives the institution credit for cooperating by reducing the penalties imposed on the institution.

9.    However, the results of that investigation are preordained.  The law firm, doing its job to protect the institution and its senior management, glosses over, obscures, and erases from the record senior management's conduct and instead targets a low-level scapegoat, here Connolly.

10.    Connolly, who was barely involved with LIBOR and who did not gain personally from any rate submission, despite, on information and belief, Deutsche Bank falsely leading DOJ to believe that he did, is handed to the government as a sacrifice.  In exchange, the government fines the institution at a discount and the charade concludes.

11.    Although this story may be routine and may be well known to many in the legal community, it does not make it any less shameful.  Deutsche Bank's conduct concerning its LIBOR submissions was known to, and approved, authorized, and directed by, the most senior Deutsche Bank officers.  Connolly relied on that direction trusting it to be appropriate and legal.  However, instead of senior management owning their conduct and knowledge, and instead of Paul Weiss doing a truly independent investigation and drawing unbiased, honest and clear conclusions about senior management's role, Deutsche Bank and Paul Weiss blamed Connolly and a few others for the conduct the government had questioned.  Conduct that was not a crime.  Conduct Deutsche Bank had designed and directed with the assistance of its extensive legal and compliance systems.

12.    What makes this case standout is that Deutsche Bank took the further step of sending a bank employee to testify at Connolly's trial, and this bank employee knowingly perjured himself in front of the District Court at Deutsche Bank's instruction.

13.    Deutsche Bank's efforts were successful.  Not a single person from its senior management was charged with any crime. Because of Deutsche Bank's cooperation with the

4

Deleted: It is a chronicle of a story foretold.

Deleted: sacrificial lamb.

Deleted: kabuki dance

Deleted: .

Deleted: rate

Deleted: an honest

Deleted: the

Deleted: and framed

Deleted: he did not commit.

Deleted: This is a story that has been told many times.

Deleted: stand-out

Deleted: temporarily

government (which included handing over Connolly as a scapegoat), the government gave Deutsche Bank a $750 million credit on an ultimate fine of $2.5 billion, a large amount without question, but one that was very manageable for an institution like Deutsche Bank and which was paid by innocent shareholders, not senior management.

14.     Connolly had his life ruined.  In 2016, eight years after leaving Deutsche Bank, he was indicted in the Southern District of New York based on information provided and information concealed by Deutsche Bank and Paul Weiss.  He fought through a trial where he was convicted of wire fraud and conspiracy to commit wire and bank fraud.  He fought through an appeal and was ultimately exonerated in 2022, when the Second Circuit overturned his conviction, finding that the way banks reported LIBOR rates, the alleged misconduct, was not illegal.  He was ultimately adjudged not "not guilty" but innocent.

15.     Even if the DOJ's investigation made Deutsche Bank uncertain if its LIBOR submission policies and procedures were proper, Deutsche Bank knew all along that Connolly had no part in developing those policies.  Connolly trusted the direction of those at the bank who did and was in no way a "rogue trader" as Deutsche Bank portrayed him to be.

16.     Connolly has been unable to work in his profession since 2016.  He has endured a criminal trial, the loss of free movement, the surrender of his passport, and the destruction of his personal and professional reputation.  It has affected his health, his children, and his wife.

17.     Deutsche Bank's decision to scapegoat Connolly to shield its senior management was shameful, wrong, and morally unconscionable.  The law provides a remedy.

18.     Connolly seeks redress for Deutsche Bank's actions.  He seeks a sum large enough, in excess of $150 million, to compensate him for his economic losses and the torment he and his

5

family have suffered, including damage to his reputation and to ~~deter and~~ punish Deutsche Bank for its role in directing the destruction of his life.

## Parties

19.     Connolly is an individual residing in New Jersey.

20.     Deutsche Bank is a multinational banking and financial services corporation organized and existing under the laws of Germany.  Deutsche Bank is headquartered in Frankfurt, Germany and maintains a United States regional head office at 1 Columbus Circle, New York, NY 10019.

## Jurisdiction and Venue

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and/or 1332(a)(2) because complete diversity of citizenship exists between the parties and the matter in controversy exceeds $75,000 exclusive of interest and costs.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in this district.

## Background

### Connolly's Work History at Deutsche Bank

23.     Mathew Connolly is from New Brunswick, New Jersey.  He grew up in a family with eight brothers and sisters. He met his wife, Beth, while attending college at Moravian University in Pennsylvania.  They were married 32 years ago at a wedding held in a local firehouse and raised their two children in New Jersey.  Connolly started his career on Wall Street in 1987 as a file clerk at JP Morgan.  He moved to Deutsche Bank in 1995 with his former JP Morgan boss and worked on Deutsche Bank's Commercial Paper Desk.  He eventually became the head of that

| | |
|---|---|
| **Deleted:** have | |
| **Deleted:** boss from | |
| **Deleted:** become | |

desk and then a trader on the Government Treasury Desk before transferring to the Pool Trading Desk in 1999. Connolly was promoted to Director shortly thereafter.

Deleted: became

24.      All Deutsche Bank cash assets and liabilities flow through the Pool Trading Desk. In 2000, Connolly became the head of the Pool Trading Desk in New York.  In that position, he managed the financing of Deutsche Bank's dollar balance sheet, as well as the flows of money from London.  Connolly's primary role was to lend Deutsche Bank's money internally to other desks that needed financing for their deals or trades; he would then go to the market to finance those internal loans.

Deleted: which

25.      In 2005, at Deutsche Bank's request, and after previously turning down the position, Connolly was assigned a supervisory role with the Money Market Derivatives Desk in New York (in addition to his other responsibilities).  His title remained Director.

Deleted: took over as head of the

Deleted: .

26.      Connolly did not personally trade in any products tied to LIBOR and did not believe his bonus to be part of the Money Market Derivatives Desk shared pool.

27.      Connolly left Deutsche Bank in March 2008, before investigations into LIBOR began.  During his approximately thirteen years at Deutsche Bank, Connolly had an unblemished record with no disciplinary complaints against him.  At the time of his departure from the bank, Connolly had supervisory roles with the Money Market Derivatives Desk, Commercial Paper Desk, Equity Stock Loan Desk, and the Repurchase Agreement Desk, but his primary day-to-day responsibility remained as head of Pool Trading Desk as a Director.

**LIBOR**

28.      "LIBOR" stands for London Interbank Offered Rate.  It is a benchmark interest rate at which major global banks lend to each other in the international interbank market for short term

7

loans.[1]  LIBOR is based on five currencies: the US dollar, the Euro, the British pound, the Japanese Yen, and the Swiss franc.

29.     The British Bankers Association ("BBA") published LIBOR rates daily for fifteen different periods (*e.g.,* overnight, one week, one month, and three months).

Deleted: , etc.).

30.     To determine LIBOR rates, BBA accepted daily submissions from sixteen "panel banks" that served the roles of "LIBOR submitters," pursuant to rules set out in the "BBA LIBOR Instruction."  Deutsche Bank served as one of the sixteen panel banks and appointed an employee in London to serve as the LIBOR submitter.  The bank was familiar with the BBA LIBOR Instruction and had policies and procedures to comply with the BBA LIBOR Instruction.

Deleted: ,

31.     Each panel bank made an estimate (to at least two decimal places) of what it believed their bank would have to pay to borrow cash from another bank.  The sixteen submissions were then averaged – with the four highest and four lowest submissions being dropped in a process known as "trimming" – and published by the BBA daily as the LIBOR rates for the fifteen periods. The trimming process was designed to prevent outlier submissions from skewing the rate.

Deleted: LIBOR submitter

**Alleged LIBOR Manipulation**

32.     Because banks have billions of dollars of investments, loans, and trading positions that are impacted by LIBOR, banks could make or lose money depending on how LIBOR moved (up or down, and by mere hundredths of a percentage point).

33.     The BBA Instruction governing LIBOR at the time barred *inter*bank communication prior to submission.  It did not bar *intra*bank communication – meaning it did not prohibit a bank from communicating internally about or considering its own trading positions as a

Deleted: <#>The trimming process was designed to prevent any one bank from intentionally moving the rate to gain an advantage for itself.  That is, the only way banks would effectively be able to move the rate would be to engage in interbank collusion, a practice that was forbidden by the BBA LIBOR Instruction. ¶
By design, LIBOR could not be affected by a single submission. ¶
**Alleged LIBOR-Rigging**¶
Traders who knew a bank's trading positions could determine which way the bank was "facing"—whether it would be economically advantageous to the bank to have LIBOR increase or decrease. ¶
It was known

---

[1] LIBOR will be phased out of use by June 30, 2023.  The discussion here refers to LIBOR as it existed during the relevant period.

part of its submission.  Deutsche Bank knew this and made it part of its LIBOR submission policies and practices for traders to communicate the bank's positions to its LIBOR submitters.

34.     It was well known in and out of the bank that traders at various banks would sometimes make requests to the LIBOR submitter at their bank to put in "high" or "low" LIBOR estimates.  If the LIBOR submitter accepted the request, the submitter might adjust the submission up or down (*e.g.*, by a hundredth of a percentage point), within a permissible range determined by many other factors (both objective and subjective).

35.     In the various LIBOR related trials brought by the DOJ since 2015, the government presented various theories of harm and fraud.  In a number of cases, defendants put forth the defense that there was nothing illegal about submitting a rate that accounted for the bank's commercial interest because, consistent with the BBA LIBOR Instruction, the submissions were within a narrow range of acceptable and accurate rates from which to choose.  Many of the trials ended in acquittals on that basis.  *See*, *e.g.*, https://www.bbc.com/news/business-39225858.

36.     On review of Connolly's conviction, the Second Circuit agreed.  On January 27, 2022, the Second Circuit reversed the conviction and ordered the District Court to enter a Judgement of Acquittal.  The Second Circuit found that even under the heavy burden of Rule 29, construing all evidence in the light most favorable to government, no reasonable trier of fact could convict Connolly because the LIBOR rates submitted were rates at which the bank could have borrowed and therefore squarely within the BBA's rules for submissions and, most significantly, the BBA LIBOR submission rules "said nothing to bar a panel bank's LIBOR submitters from receiving or considering input from that bank's employees who were derivatives traders."  *United States v. Connolly*, 24 F.4th 821, 842-43 (2d Cir. 2022).

9

**Connolly's Connection to LIBOR and Deutsche Bank's Instructions and Policy Regarding LIBOR Submissions**

37.     Connolly did not trade any products tied to LIBOR; his primary responsibilities were funding Deutsche Bank and running the Pool Trading Desk.  On information and belief, Deutsche Bank told the DOJ that Connolly was motivated financially to manipulate the bank's LIBOR submissions, which the DOJ relied upon and repeated to the grand jury.  This was false, as Connolly did not personally profit from trades involving LIBOR rates and had no motive to engage in the alleged conspiracy.

38.     At the same time, the Deutsche Bank Money Market Derivatives Desk – over which Connolly did not yet have any supervisory responsibility – was required to use LIBOR when customers asked for markets in LIBOR.

39.     In or around 2004, Connolly's boss, who was based in London, told him that Deutsche Bank's LIBOR risk should be communicated to Deutsche Bank's LIBOR submitter.  That is, although Connolly did not trade LIBOR and did not manage the Money Market Derivatives Desk, his London based boss directed him to advise traders on the Money Market Derivatives Desk to assess Deutsche Bank's LIBOR position (whether it would be advantageous to Deutsche Bank's commercial positions to have the LIBOR rate increase or decrease) and to communicate that to Deutsche Bank's LIBOR submitters in London.

40.     The request was consistent with Deutsche Bank's established policies and practices and Connolly believed it to be proper because LIBOR submissions could fall within a range, and he had every reason to trust his employer's direction, facts left out of the presentation to the grand jury.  On information and belief, Deutsche Bank did not provide this information to the DOJ, and it was not presented to the grand jury.

10

**Deleted:** In or around 2001, while he was the head of the Pool Trading Desk in New York for Deutsche Bank, Connolly concluded that the LIBOR rate did not accurately reflect what was going on in the market.  He found there was frequently a significant discrepancy between the actual rates being used in daily transactions and the "made up" LIBOR rate.  Connolly himself

**Deleted:** cash desk.  He therefore chose

**Deleted:** use other benchmarks for his

**Deleted:** (*e.g.*, the Overnight Index Swap ("OIS")—a rate calculated based on real transactions as opposed to the conjectures of sixteen banks).  He also advised traders on his desk *not*

**Formatted:** Font: Not Italic

**Deleted:** rely on LIBOR, and to instead make trades against other benchmarks.

**Formatted:** Font: Italic

**Deleted:** then run

**Deleted:** derivatives desk

**Deleted:** Connolly did not believe this was an improper

**Deleted:** since it was well-

**Deleted:** that

**Deleted:** .  Moreover, the trimming process avoided a situation where a single bank could influence the rates.

41.     Connolly was subsequently assigned a supervisory role with the Money Market Derivatives Desk.

42.     Deutsche Bank knew that the making and receiving of requests to adjust the LIBOR submission up or down was permitted by the BBA LIBOR Instruction and was not only acceptable to – but was specifically directed by – Deutsche Bank senior management.

43.     The *Wall Street Journal* published an article on LIBOR in April 2008 that warned of concerns that LIBOR was "becoming unreliable."  It noted that "bankers and other market participants have quietly expressed concerns to the British Banking Authority, which oversees Libor, about whether banks are reporting rates that reflect their true borrowing costs . . . .", Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, WALL ST. J., April 16, 2008 https://www.wsj.com/articles/SB120831164167818299.

44.     Despite the controversy caused by the *Wall Street Journal* article, in a June 10, 2008 consultative paper – "Understanding the construction and operating of BBA Libor – Strength for the future" – the BBA decided to leave its LIBOR definition unchanged and requested feedback from the market on the LIBOR process.  In response, the Chicago Mercantile Exchange ("CME"), one of the largest derivatives exchanges, sent a letter to the BBA addressing "the frequent accusation that Contributor Panelists habitually submit false or biased responses to the daily Libor survey," concluding that "[a] Contributor Panelist who can borrow 'in reasonable market size' at any one of a wide range of offered rates commits no falsehood if she bases her response to the daily Libor survey upon the lowest of these (or the highest, or any other arbitrary selection from among them)."  That is, in 2008, it was acknowledged that there was a range of LIBOR rates which a given submitter could reasonably proffer and that panel banks could choose within that range for any reason.

**The Investigation**

45.  By 2010, the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and the DOJ were all investigating LIBOR including Deutsche Bank's potential role.  On April 19, 2010, the CFTC sent Deutsche Bank a letter advising that the CFTC's Division of Enforcement was investigating whether LIBOR panel banks' submissions were false or misleading.  The CFTC stated that it expected Deutsche Bank to cooperate fully with the investigation, including Deutsche Bank's retention of outside counsel to conduct an internal investigation:

> [T]he Division requests that Deutsche Bank . . . voluntarily conduct by **external** counsel a full review of Deutsche Bank's U.S. Dollar LIBOR reporting for the relevant time period, and report on an ongoing basis the results of that review to the Division, with the review to be completed by no later than September 1, 2010.

(Original emphasis.) The initial review period was from 2007 to 2008, but it was subsequently expanded to include 2005 to 2012.

46.  Deutsche Bank hired Paul Weiss, in the US, and Slaughter and May, in the UK, to handle its internal investigation for the DOJ and other agencies.

47.  In a CFTC letter dated July 14, 2010, the CFTC detailed that it had multiple telephone conversations with Paul Weiss to coordinate the first stage of the internal investigation, including Paul Weiss' agreement to take certain specific investigative actions, and stated the CFTC's expectation that Paul Weiss provide weekly updates concerning the progress of the investigation, including the simultaneous productions of responsive documents and information uncovered in the internal investigation.

48.  From 2010 to 2015, Deutsche Bank paid Paul Weiss and Slaughter and May over $100 million for the LIBOR investigation, which included reviewing 158 million electronic

**Deleted:**

documents, listening to 850,00 audio files, conducting nearly 200 interviews of more than fifty bank employees, and engaging in hundreds of communications with the government. For more than a year leading up to the conclusion of the investigation, Paul Weiss held weekly calls with the DOJ, CFTC and FBI.

49.     As later determined by the Chief Judge of the Southern District of New York, Colleen McMahon, "[i]t is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that Paul Weiss provided—illuminating just how the Government should 'investigate' the case against certain Deutsche Bank employees." *United States v. Connolly*, 16-cr-00370-CM, Dkt. No. 432, at 18-19 (May 2, 2019, SDNY). Further, Judge McMahon wrote that Paul Weiss "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect. . . . In other words, Paul Weiss did everything that the Government could, should, and would have done had the Government been doing its own work." *Id.* at 23-24. In sum, "[t]he only conclusion one can draw . . . is that, rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to Deutsche Bank—the original target of that investigation—and then built its own 'investigation' into specific employees," including Connolly, that Deutsche Bank had singled out for prosecution. *Id.*

50.     In a January 21, 2015, Paul Weiss document known as the "White Paper," Paul Weiss detailed the many ways Deutsche Bank and Paul Weiss assisted the government, including parsing the enormous amount of information obtained and directing the government to Deutsche Bank's preferred targets.

51.     The White Paper stated that "these volumes of data and documents would be virtually impossible to navigate without direction," and thus "the Bank promptly sought to point

the DOJ to the information it would find most relevant." Further, "[t]he Bank took extraordinary efforts to distinguish between information that was merely responsive to the DOJ's requests and information that was 'notable,' in that it contained evidence or information that the Bank believed would be of particular interest."

52. The White Paper concluded that Deutsche Bank and Paul Weiss expected the government to decide who to charge and prosecute based on the documents Deutsche Bank highlighted for the government:

> We believe that these efforts . . . have provided the DOJ with a full and complete picture of the facts. Indeed, **we expect that much (if not most) of the information that will ultimately be used in making charging decisions . . . will have come from the Bank's identification of notable communications and its having brought those communications to the DOJ's attention.** [Emphasis added.]

## Deutsche Bank's Settlement with the Government

53. The enormous effort and expense of the investigation, and the serving up of specific employees such as Connolly for prosecution, benefitted Deutsche Bank many times over when it settled with the government. As detailed in Deutsche Bank's April 23, 2015, Deferred Prosecution Agreement (available at https://www.justice.gov/criminal-vns/united-states-v-db-group-services-uk-limited-and-deutsche-bank-ag):

> [U]pon being alerted to an investigation by the Department [of Justice] and other regulatory authorities, Deutsche Bank commenced an internal investigation and cooperated with authorities, including disclosing much of the misconduct described in the Information and Statement of Facts. Deutsche Bank collected, analyzed, and organized voluminous evidence, data, and information, and did so in a way that saved the Department significant resources by identifying certain documents and segments of audio files and providing translations for certain documents where applicable. Deutsche Bank also assisted and facilitated the Department's interviews of current and former employees, including foreign employees and Deutsche Bank communicated

14

**Deleted:** (

**Deleted:** .)

**Deleted:** ¶

**Moved up [2]:** <#>As later determined by the Chief Judge of the Southern District of New York, Colleen McMahon, "[i]t is hard not to conclude that the Government did not conduct a single interview of its own without first using a road map that Paul Weiss provided—illuminating just how the Government should 'investigate' the case against certain Deutsche Bank employees."

**Moved up [3]:** <#> In sum, "[t]he only conclusion one can draw . . . is that, rather than conduct its own investigation, the Government outsourced the important developmental stage of its investigation to Deutsche Bank—the original target of that investigation—and then built its own 'investigation' into specific employees," including Connolly

**Deleted:** <#>Further, Judge McMahon wrote that Paul Weiss "digested the vast information it collected, highlighted the most important nuggets, and shared a blueprint for what prosecutors should expect."

**Deleted:** <#>.¶

**Moved up [1]:** <#>For more than a year leading up to the conclusion of the investigation, Paul Weiss held weekly calls with the DOJ, CFTC and FBI.

**Deleted:** <#>From 2010 to 2015, Deutsche Bank paid Paul Weiss and a UK firm, Slaughter and May, over $100 million for the LIBOR investigation, which included reviewing 158 million electronic documents, listening to 850,00 audio files, conducting nearly 200 interviews of more than fifty bank employees, and engaging in hundreds of communications with the government.

**Deleted:** <#>¶

**Deleted:** <#>:

with and updated the Department with increasing frequency as the investigation progressed.

54.     In exchange for Deutsche Bank's comprehensive cooperation, the government granted Deutsche Bank a significant discount on the combined $2.5 billion in fines Deutsche Bank agreed to pay as part of settlements entered in April 2015 (which would have been $3.25 billion without the cooperation discount). In other words, Deutsche Bank's cooperation was worth $750 million.

55.     As part of the settlement, no member of Deutsche Bank's protected class of senior management was fined, prosecuted, or deregistered.  Although senior management's role in the alleged LIBOR manipulation scheme was well known to the government, Deutsche Bank also successfully negotiated as part of the Deferred Prosecution Agreement that there would be no admission of wrongdoing by senior management.

56.     Actual evidence of this type of trade — where senior management is protected from government prosecution in return for a scapegoat plus a large fine paid by the company (*i.e.*, by innocent shareholders) — is rarely obtained.  Here, we know what happened.

57.     The DOJ originally prepared a draft "Statement of Facts" that was to be incorporated into the Deferred Prosecution Agreement. The DOJ's draft Statement of Facts included a section titled, "DB Management Awareness of the Conduct, Tolerance of the Conflicts of Interest and Promotion of Culpable Individuals," which stated that "[c]ertain DB managers and senior managers were aware of requests by DB derivatives traders to submit LIBOR and EURIBOR rates that benefitted trading positions" and that "a senior manager and the head of GFFX in London, knew that traders and submitters coordinated LIBOR submissions and encouraged the coordination." The draft further stated that "DB senior managers and managers . . . recklessly disregarded significant conflicts of interests [including] encouraging open

15

communications between traders and submitters and seating many of them together" and that "[a]t least part of the motivation for this sharing of information was to ensure that the bank coordinated conduct among traders and the submitters to benefit the bank as a whole." *United States v. Connolly*, 16-cr-00370-CM, Dkt. No. 399-12 (December 10, 2018, SDNY).

58.     The final Statement of Facts – issued after the DOJ cut its final deal with Deutsche Bank – dramatically downplayed these allegations.  The section title was drastically toned down to "DB Management" with no mention of their awareness or encouragement of the conduct.  And only a single senior manager – not multiple – was identified as having overseen the LIBOR submissions, while references to desk level managers (including Connolly) and a mid-level manager were retained. The phrase "recklessly disregarded" was also removed.

59.     After successfully bargaining away any acknowledgement of culpability by its most senior leaders, Deutsche Bank agreed in the final Statement of Facts that its LIBOR "rate submissions were false and misleading" and that "in making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct." Deutsche Bank further "acknowledge[d] that the wrongful acts taken by the participating employees in furtherance of the misconduct . . . were within the scope of their employment at [Deutsche Bank]." Deutsche Bank knew these statements were false and omitted important facts, but nonetheless accepted the government's theory in a self-serving and successful bid to avoid prosecution, insulate senior executives and reduce its settlement payment.

60.     Deutsche Bank agreed in the Deferred Prosecution Agreement, and affirmed to be "true and accurate," that Connolly was one of the employees who engaged in this supposed misconduct.  Deutsche Bank knew that this was false, and that it was not misconduct at all.

**Deutsche Bank Scapegoats Connolly.**

61.     The DOJ expected that Deutsche Bank would identify individual employees. Accordingly, Deutsche Bank could, and did, identify Connolly for prosecution, even though the evidence in Deutsche Bank's possession demonstrated that executives far senior to Connolly and reaching up into the C-Suite, including Deutsche Bank's Global Chief Executive and Co-Chairman Anshu Jain, its Global Head of Rates Alan Clote, and its Global Head of Finance David Nicholls, actually approved and directed derivatives traders and LIBOR submitters to share information about trading positions.  Such senior managers were even responsible for the physical restructuring of the bank's floor plan so that the Money Market Derivative Desk and the Pool Trading Desk were closer to each other so they could more easily share their risk positions, including on LIBOR.

62.     But as Connolly would learn, an intentional decision was made by Deutsche Bank to insulate senior persons, executives, decisions makers, and legal and compliance from scrutiny. Rather than direct the DOJ to information regarding the decision makers, or defend its policies and practices, Deutsche Bank steered attention to lower-level traders and desk managers, including Connolly, who were following the policies and practices that had been dictated by those senior executives and that the BBA had approved.

63.     Fewer than 5 of the approximately 100 people trading LIBOR-based derivatives worldwide for Deutsche Bank were based in New York. The two scrutinized were the lowest-level people in New York who had any involvement with LIBOR: Tim Parietti, Deutsche Bank's LIBOR trader for the New York office, and Connolly, who had supervisory responsibilities over Parietti's desk but did not himself trade LIBOR-based derivatives.

64.     On information and belief, at some point during the investigation, the bank focused the DOJ's attention on four emails sent or received by Connolly that were later the subject of

17

Deleted: ¶
In September 2015, then-Attorney General Sally Yates announced in what came to be known as the "Yates Memo" that the government would increase its focus on the prosecution of individuals for financial crimes.

Formatted: Font: Bold, Underline

Formatted: Normal, Right: 1", No bullets or numbering, Keep with next

Deleted: Yates Memo established a new DOJ policy focusing on the investigation of individuals and creating new rules under which the DOJ would afford companies credit for cooperation with an investigation. The Yates Memo required that companies identify **all** individuals involved in **any** aspect of alleged misconduct, regardless of their status or seniority, for the company to receive **any** credit for its cooperation with the government. The threat of withheld cooperation credit on an all-or-nothing basis, plus the requirement that all potentially involved individuals be identified before a settlement could be finalized, gave the government significant leverage to demand that companies point out individuals.  This, of course, created incentive for companies to protect senior management and identify scapegoats. ¶
It is widely acknowledged that the Yates Memo effectively caused banks and other companies being investigated to become deputized arms of the government. Sharon Oded, *Coughing Up Executives or Rolling the Dice?: Individual Accountability for Corporate Corruption*, 35 Yale L. & Pol'y Rev. 49 (2016).¶
Consistent with the Yates Memo, there was a clear expectation on the part of the DOJ that Deutsche Bank would provide the names of individual employees whom Deutsche Bank and Paul Weiss believed should or could be prosecuted. Deutsche Bank therefore could – and did – influence the evidence the prosecution considered.¶
The

Deleted: influenced the bank's reporting of LIBOR rates by encouraging

Deleted: liability

Deleted: involvement of

Deleted: senior executives,

Deleted: and Paul Weiss instead focused

Deleted: on

Deleted: .

Deleted:

Deleted: who were subjected to focus

Deleted: was the head of

testimony at the grand jury and at trial. FBI Special Agent ("SA") Jeffrey Weeks testified to the grand jury that he relied on explanations and interpretations given to him by Deutsche Bank to understand the emails. *United States v. Connolly*, Grand Jury, Weeks Tr. 50:11-51:18, May 31, 2016. The four emails sent or received by Connolly could not have on their own given rise to probable cause in light of the BBA LIBOR Instruction and Deutsche Bank's policy and practices; rather some additional "interpretation" from the bank was necessary.

65.     The first email, dated November 23, 2005, was sent from Connolly to Deutsche Bank's two LIBOR submitters, Mike Curtler and James King in London. It stated "OTC **request** 3-month LIBOR as high **as possible** Thursday and Friday **if you see** the market higher. Thanks." (Emphasis added.) The response from King indicated that the submitters would not accept the request: "Matt, we've gone in relatively neutral as a high 3s doesn't suit London at the moment. Hope that's ok. James." Connolly responded, "**Doesn't matter to me** . . . May matter to OTC/rates NY . . . we will all find out I guess." (Emphasis added.)

66.     "OTC" stands for "over the counter." Because there is no regulated exchange for derivative trades, those transactions, which are direct between banks, are known as "OTC trades." Connolly did not supervise the OTC desk, so even if money had been made by the OTC desk based on the email, neither Connolly nor his desk would have profited from it.

67.     The second email, dated November 28, 2005, was from Connolly in response to a question from one of the submitters. Curtler advised, "1 mth over the turn is looking like 26-32 hahaha – anything either way from you guys? We are still short." Connolly responded, "Hahahah never fails. We would **prefer** it higher. We have about 15 BB 1 mo receives. Thanks. Just asking is very much appreciated . . . ." (Emphasis added.) Curtler responded, "will do like James then – ask, and do the opposite…let us know the days you rec, first fix tom will set the tone."

18

68. The third email, dated August 12, 2007, from Connolly to Curtler and King stated, "**If possible**, we need in NY 1 mo libor as low **as possible** next few days...tons of pays coming up overall...thanks!" (Emphasis added.)

69. The fourth email from March 2006 (on which Connolly was merely copied) was from Parietti to King in which Parietti wrote "[r]egarding Mondays 3mLibor, MMD NY is receiving 3mL on USD 6.5 Bn so **hoping** for higher 3mL." (Emphasis added.)

70. Connolly understood at the time that each of these four email exchanges complied with bank policies and the specific direction he had received in 2004 from his boss. The emails, if read plainly, show that Connolly did not direct Deutsche Bank's LIBOR submitters to do anything. Instead, the emails reflect communication of preferences and positions, not directives, that the submitters could either consider or ignore. All were conditioned, making general, directional requests (high or low) without requesting a specific rate-submission, and reflect that Connolly had no authority over Deutsche Bank's LIBOR submitters. None of the email exchanges show an intent to tender a false LIBOR submission that deviated from the BBA's LIBOR Instruction. But, based on Deutsche Bank's "explanations," SA Weeks interpreted them for the grand jury as LIBOR manipulation.

71. When Deutsche Bank first approached Connolly regarding LIBOR issues in February 2013 – five years after he had left Deutsche Bank – it was to inform him that Deutsche Bank had given his emails to the FBI, which was among the government agencies looking into the matter. Connolly was not concerned; he knew that he taken little action regarding LIBOR, and that any action he had taken was consistent with Deutsche Bank policies and instructions.

72. The FBI subsequently sought to interview Connolly. Deutsche Bank offered to pay Connolly's legal fees. Connolly willingly participated in a seven plus hour interview with more

than twenty people present from various government agencies, including the FBI, DOJ, SEC, CFTC, and others.

73. During his interview, Connolly repeated the truth: that Deutsche Bank's senior management had directed both Connolly and Parietti to communicate the bank's positions to Deutsche Bank's LIBOR submitters.

74. Connolly left the interview unconcerned since: (a) his LIBOR involvement was extremely limited; and (b) any involvement he had and action he took in connection with LIBOR had been directed by Deutsche Bank.

75. In late April 2016 – eight years after Connolly had left Deutsche Bank – the DOJ advised Connolly's lawyer that Connolly was a target of its investigation of individuals from Deutsche Bank connected to alleged LIBOR manipulation. Both Connolly and his attorney were stunned.

76. The DOJ's investigation and its understanding of the events was tainted, indeed manipulated, by Deutsche Bank's efforts to draw scrutiny away from its senior executive decision makers and towards Connolly and other mid-level traders, desk managers, and employees. That taint and manipulation started with the investigation, impacted the grand jury proceeding, and persisted through trial.

**The Indictment**

77. On May 31, 2016, the DOJ indicted Connolly in the Southern District of New York. The indictment was based on Deutsche Bank's intentionally skewed investigation and knowingly false presentation and omission of information to the government.

78. Gavin Black, a Deutsche Bank employee in London, was indicted along with Connolly. Black, like Connolly, was far from being a senior executive at Deutsche Bank.

79.	To procure the indictment, the government repeated Deutsche Bank's false presentation to the grand jury, including material omissions, through its lone grand jury witness SA Weeks, and 38 exhibits.

80.	For example, SA Weeks provided factually inaccurate testimony stating that Deutsche Bank's trade data, which Deutsche Bank had provided and parsed for the government, established that Connolly made requests to the bank's LIBOR submitters to benefit the bank's trading positions.  (Weeks Tr. 36:8-37:19.)  SA Weeks had no basis for this testimony other than what Deutsche Bank told him.

81.	SA Weeks testified that LIBOR panel bank submitters would consider certain factors in calculating LIBOR submissions, including "borrowing transactions" and "other sources of market information" such as the direction debt markets were moving and newsworthy events. (Weeks Tr. 8:2-23.) The grand jury was also shown as Exhibit 37 a slide deck summarizing LIBOR basics that included a slide listing "Common Submission Datapoints" including "Money Market transactions, if available," "Cash brokers," "Financial/political news," and "Other factors indicating where they can actually borrow money." Both SA Weeks and Exhibit 37 omitted that a panel bank may account for its trading positions in calculating LIBOR submissions consistent with the BBA LIBOR Instruction (which was not presented to the grand jury either). On information and belief, this presentation to the grand jury was based on the information Deutsche Bank provided the government and would have mislead the grand jury into believing that Connolly's communications with Deutsche Bank's LIBOR submitters were attempts to manipulate Deutsche Bank's LIBOR submissions, which Deutsche Bank knew was false.

82.	SA Weeks also testified that he observed, through documents he reviewed with the bank's help, LIBOR manipulation at Deutsche Bank by traders with a "profit or loss interest in the

21

movement of LIBOR rates" who requested changes to the bank's LIBOR submissions and that Connolly, Black, "and their co-conspirators conspired together to make sure it was common practice for certain traders who were affected by LIBOR to both make requests to the setter who's setting LIBOR, and with the understanding that that setter would help them, in any way that he could, to change his rates to help their trading positions." (Weeks Tr. 33:17-34:5, 36:16-24.) On information and belief, Deutsche Bank led the government to believe that Connolly had a "profit or loss interest in the movement of LIBOR rates," which was false, and the government – relying on Deutsche Bank – repeated this misinformation to the grand jury.

83.    Further, SA Weeks testified that Connolly's "role in the alleged conspiracy and scheme" was that Connolly "instructed one of his money market derivative traders to submit requests to the LIBOR setters in London whenever he had significant positions that would benefit from setting LIBOR in a certain way," and that Connolly instructed Parietti "to make sure that he submitted these preferences when he had large exposure." (Weeks Tr. 44:11-17; 47:17-24.) On information and belief, Deutsche Bank caused the government to present a misleading account to the grand jury, including that Connolly's actions were improper and that he acted independently for his own benefit, while omitting that Deutsche Bank's senior management and executives directed Connolly's conduct, Connolly believed it to be lawful, and his performance/compensation did not depend on LIBOR movement.

84.    Among the things about which SA Weeks did not testify: that Deutsche Bank senior executives approved, implemented and directed the bank's policies and practices regarding LIBOR submissions; that Deutsche Bank had extensive legal and compliance departments that would have overseen these decisions; that Connolly had no role in determining the policies and practices; and that Connolly did not trade in or profit from any LIBOR connected products. On information and

22

belief, these omissions in SA Week's testimony and which undermine the grand jury's ability to find probable cause and to consider scienter, were based on the misleading picture Deutsche Bank provided to the DOJ.

85.     Further, SA Weeks answered several questions about how the orientation of Deutsche Bank's trading floors allowed easy communication between traders and LIBOR submitters, omitting that Deutsche Bank senior executives had arranged the floor plans to facilitate this communication.  (Weeks Tr. 40:14-41:3; 48:15-49:13; 52:2-8; 55:18-23.)  On information and belief, Deutsche Bank caused the government to withhold information about Deutsche Bank senior managers and executives from the grand jury.

86.     Connolly was arrested and arraigned on June 1, 2016.

87.     Connolly was informed that the charges stemmed from the investigation that the DOJ had conducted.   What Connolly did not understand at the time was that the DOJ's investigation was premised almost entirely on information fed to them by Deutsche Bank.  In fact, SA Weeks testified that his testimony was based on documents, communications, and information obtained from Deutsche Bank, including "data from Deutsche Bank" that purported to show "the trading positions for different traders on different days," which SA Weeks called an "important source of information to our investigation."  (Weeks Tr. 37:11-19.)   This demonstrates that the government could not have targeted Connolly without Deutsche Bank's direction and Deutsche Bank's misleading portrayal to the government of Connolly's conduct.

**Deutsche Bank and DOJ Misconduct at Trial**

88.     On October 18, 2019, Connolly and Black's trial began with Judge McMahon presiding.

Deleted: However, this was just the beginning of Deutsche Bank's scheme to frame Connolly.

Deleted: SDNY Proceeding and the Lack of Evidence Against Connolly…

89.     Notwithstanding that they were being charged with conspiracy, Connolly and Black had never met, spoken or otherwise communicated before the trial.

90.     The DOJ alleged that Connolly directed his subordinates to submit false LIBOR rates to advance Deutsche Bank traders' interests. This was based on the false narrative developed long before; Deutsche Bank's LIBOR submitters were not subordinate to Connolly, did not report to him and he did not give them directives.

91.     In her opening statement at trial, the prosecutor told the jury that "[i]n [Connolly and Black's] quest to make every extra dollar they could . . . they cheated by rigging the LIBOR interest rate." This was based on false information from Deutsche Bank that Connolly had a personal financial interest in attempting to increase bank revenue through LIBOR submission adjustments, which he did not.

92.     During the trial, a prosecution witness who worked for Deutsche Bank admitted that he had committed perjury twice during the trial at the direction of a Deutsche Bank lawyer and DOJ prosecutor.

93.     The witness, Guy Weston-Edwards, a Deutsche Bank employee in the IT department who served as Deutsche Bank's head of production support for fixed income and currencies, had sworn under oath in two affidavits that documents which falsely tied Connolly to portfolios and counterparties that Connolly had no connection to were true and accurate Deutsche Bank business records.

94.     Because Deutsche Bank and the government could not tie Connolly to any specific LIBOR trades, they got creative: they referenced a portfolio of Parietti's (which *did* have LIBOR trades), cut and pasted data from multiple business records into four spreadsheets, and submitted

24

**Deleted:** claimed

**Moved up [4]:** <#>The first email, dated November 23, 2005, was sent from Connolly to Deutsche Bank's two LIBOR submitters, Mike Curtler and James King in London. It stated "OTC **request** 3-month LIBOR as high **as possible** Thursday and Friday **if you see** the market higher.

**Moved up [5]:** <#>"Hope that's ok. James." Connolly responded, "**Doesn't matter to me** . . . May matter to OTC/rates NY . . . we will all find out I guess."

**Moved up [6]:** <#>(Emphasis added.) ¶
"OTC" stands for "over the counter." Because there is no regulated exchange for derivative trades, those transactions, which are direct between banks, are known as "OTC trades." Connolly did not supervise the OTC desk, so even if money had been made by the OTC desk based on

**Moved up [7]:** <#>The second email, dated November 28, 2005, was from Connolly to Curtler and King to one of the submitters. Curtler advised, "1 mth over the turn is looking like 26-32 hahaha – anything either way from you guys? We are still short."

**Moved up [8]:** <#>"Hahahah never fails. We would **prefer** it higher. We have about 15 BB 1 mo receives. Thanks. Just asking is very much appreciated . . . ."

**Moved up [9]:** <#>The third email, dated August 12, 2007, from Connolly to Curtler and King stated, "**If possible**, we need in NY 1 mo libor as low **as possible** next few days...tons of pays coming up overall...thanks!"

**Deleted:** <#>No evidence was submitted during trial to indicate that Connolly's compensation increased based on any activity related to LIBOR.¶
The entirety of the evidence against Connolly focused on **four** emails, all of which were more than twelve years old. Connolly had sent three, and had been copied on one.¶

**Deleted:** <#>Connolly understood this request to be consistent with bank policy and the specific direction he had received in 2004 from his boss in London. ¶
The response from King indicated that they had **not** accepted Connolly's recommendation to submit a higher rate: "... [1]

**Deleted:** <#>his request, neither Connolly nor his desk would have profited from it.¶

**Deleted:** <#>Connolly responded,

**Deleted:** <#>Curtler responded, "will do like James then – ask, and do the opposite...let us know the days you rec ... [2]

**Deleted:** <#>Review of the LIBOR submissions for that date showed the Deutsche Bank submission was an outlier, ... [3]

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Formatted:** Font: Bold

**Deleted:** a single spreadsheet

those spreadsheets as original Deutsche Bank business records to link Connolly to the trades as Parietti's supervisor.

95.     Weston-Edwards had advised Deutsche Bank, Deutsche Bank's attorneys, and attorneys from the DOJ that such documents were *not*, in fact, original Deutsche Bank business records, but were created after the fact by an outside research firm. Deutsche Bank and the DOJ nonetheless instructed him to sign the affidavits attesting to such documents being "original records or true and accurate copies of records that . . . were kept in the course of a regularly conducted business activity."

96.     In the courtroom, Weston-Edwards physically pointed to one of the attorneys for the government, Michael Koenig, who had given him the instruction. He also specifically named Jesse Crew, an in-house attorney for Deutsche Bank, as having directed him to testify that the spreadsheet was an original business record and to certify its authenticity.

97.     Judge McMahon was livid, scolding the prosecutors, "[y]ou should be ashamed of yourselves." She noted, "I am so upset about this affidavit thing. I find it appalling," and added that she was "stupefied by everything that's happened here."

98.     Judge McMahon's reference to "everything that's happened here" had to do with the numerous improper actions the DOJ – squarely through and relying on Deutsche Bank's assistance – had taken over the course of the trial.

99.     She chastised the prosecution, "if I had ten dollars for every time you ever stood up and said that you misspoke, it's more times in one case than the collective misspeaking of the Department of Justice in all of my 20-year criminal docket." She added, "I have never had a trial with so many surprises, fiascoes, [and] retractions, it hasn't happened."

100.    As noted above, most of the information the DOJ had presented against Connolly had been given to it by Deutsche Bank.

101.    Judge McMahon found that the DOJ did not conduct any interviews of its own until the witness had "first passed through the maw of" Paul Weiss. *United States v. Connolly*, 16-cr-00370-CM, Dkt. No. 432, at 18 (May 2, 2019, SDNY).  Paul Weiss recognized this fact in its White Paper.

102.    In addition, Deutsche Bank's effort to mislead resulted in the government putting on a false narrative at trial.  For example, the government elicited misleading testimony to imply to the jury that Deutsche Bank senior management and executives had no knowledge or involvement in the alleged conduct, which was false.  Deutsche Bank knew this to be false and it caused the government to mislead the jury.

103.    The consequences were clear.  As Judge McMahon wrote, "there are profound implications if the Government, as has been suggested elsewhere, is routinely outsourcing its investigations into complex financial matters to the targets of those investigations, who are in a uniquely coercive position *vis-à-vis* potential targets of criminal activity." *Id.* at 2.

104.    The conclusion is apparent:  Deutsche Bank told the DOJ to focus on Connolly as a target (which led to his indictment), and did so both to draw attention away from the Deutsche Bank senior executives who – unlike Connolly – had actual responsibility with regard to LIBOR and to help itself in its settlement negotiations with the government.

105.    Deutsche Bank's effort to direct the DOJ *toward* Connolly and *away* from high-level Deutsche Bank executives was a blatant move to distance itself from the LIBOR investigation and to claim it had not countenanced the actions of "rogue traders."

106.    In short, all Connolly had done was send three emails (and be copied on a fourth), which he understood to be, and were, fully in line with Deutsche Bank's policies and his superiors' specific instructions.  Yet, Deutsche Bank chose Connolly to serve as the New York fall-guy.

**Connolly's Conviction and Sentencing**

107.    On October 17, 2019, Connolly was convicted of conspiracy to commit wire and bank fraud, in connection with the submission of statements that could affect LIBOR.

108.    The District Court's belief in the role Deutsche Bank played in the events at issue, and Connolly's overall lack of culpability, was on full display at Connolly's sentencing hearing.

109.    Judge McMahon stated, "Defendants didn't put anything over on Deutsche Bank. What was going on was no secret, and was – from all the evidence I have seen and heard – encouraged, if not orchestrated, by senior officials at the bank for the benefit of the bank." *United States v. Connolly*, 16-cr-370-CM, Dkt. No. 457 (Oct. 24, 2019, SDNY) (Tr. 38:24-39:2).  She added, "I don't believe [Parietti] did what he did because Matt Connolly told him to – and neither did the jury – but I do believe his testimony that senior management at the bank directed this activity.  And Matt Connolly was not part of the senior management at Deutsche Bank." *Id.* at 43:24-44:3.

110.    Judge McMahon continued, "I do think it is fair to say that the government has used Mr. Connolly and Mr. Black, as well as a few other people – none of whom was at the highest levels – as proxy wrongdoers, to make them an example for the wrongdoings of those institutions, Deutsche Bank and Rabobank in this court, and for similar wrongdoing of other unindicted institutions as well." *Id.* at 85:13-19.  She explained, "I [ ] cannot make Mr. Connolly and Mr. Black scapegoats for the sins of the entire industry." *Id.* at 86:9-11.

Deleted: district court's

Deleted: . . . .

111.    When it came time to render the sentences, Judge McMahon stated: "Mr. Black . . . you were really a bit player in this.  Mr. Connolly was barely a player at all.  And given what has happened to everybody else in this case, and what has not happened to a lot of people who aren't in this case – and aren't in other cases – it would be a travesty to sentence Matt Connolly to a term of incarceration. . . . I can't mete out a sentence of imprisonment on Mr. Connolly who truly – I have been through this evidence – is the least culpable person I have heard about. . . . I'm always uncomfortable when I'm asked in any context . . . to sentence the low man on the totem pole while the big guy goes free." *Id.* at 92:17-93:22.

112.    The Court sentenced Connolly to time served and supervised released which included six months of home confinement.  He was also ordered to pay a $100,000 fine.

**Appeal and Acquittal**

113.    Connolly and Black appealed.

114.    In reversing Connolly and Black's convictions, the Second Circuit held that while the BBA LIBOR Instruction prohibited collusion between panel banks, it did not have a similar prohibition against banks making their LIBOR submissions with consideration of the bank's own interest-rate-sensitive derivatives; in short, nothing in the BBA's LIBOR Instruction prevented a panel bank's LIBOR submitters from receiving or considering intrabank input, such as the input provided by Connolly.  Simply put, the Second Circuit found Connolly innocent—that his actions were not unlawful and that he had committed no wrongdoing.

115.    On January 27, 2022, the Second Circuit overturned Connolly's conviction and directed the District Court to enter a judgment of acquittal.  *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022).

**First Cause of Action**
**(Malicious Prosecution)**

116.     Connolly repeats and realleges the allegations set forth herein.

117.     Deutsche Bank initiated and continued a criminal proceeding against Connolly, including by making materially false representations and omissions to the DOJ.

118.     Deutsche Bank knew at the time that such representations and omissions were false.

119.     Deutsche Bank acted with malice by initiating and continuing the proceeding against Connolly due to the wrong and improper motive of making such false representations and omissions in an effort to limit its own civil, criminal and regulatory liability, and to protect its senior management.

120.     Deutsche Bank had no probable cause to believe that its claims against Connolly would succeed since it knew that its representations were false.  Deutsche Bank was motivated by an improper and self-serving motive in helping to secure Connolly's indictment.

121.     During the trial, Deutsche Bank put forth perjured testimony by a Deutsche Bank employee in a further effort to obtain favor with the government and to secure a conviction of Connolly.

122.     Connolly's conviction, which was based on Deutsche Bank's false representations and omissions, was overturned on appeal, and Connolly was acquitted.

123.     Connolly has suffered significant damages as a result of Deutsche Bank's malicious conduct.

WHEREFORE, Plaintiff prays that this Court grant:

    (a)  an award of damages to Plaintiff in an amount to be determined by the Court of not less

            than $150,000,000;

    (b)  exemplary damages to Plaintiff in an amount to be determined by the Court;

    (c)  awards of pre- and post- judgment interest in favor of Plaintiff;

    (d)  an award of attorneys' fees and all other applicable costs of this action to Plaintiff;

    (e)  punitive damages; and

    (f)  such other and further relief as this Court may deem just and proper.

<u>**Jury Demand**</u>

      Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated: February 6, 2023
       New York, New York

<div style="float:right;border:1px solid red;padding:2px;">**Deleted:** November 17, 2022</div>

                      /s/ David B. Wechsler
                      David B. Wechsler, Esq.
                      Jonathan Harris, Esq.
                      Julie Withers, Esq
                      Daniel Grossman, Esq.
                      HARRIS ST. LAURENT & WECHSLER LLP
                      40 Wall Street, 53rd Floor
                      New York, NY 10005
                      (212) 397-3370
                      jon@hs-law.com
                      dwechsler@hs-law.com
                      jwithers@hs-law.com
                      dgrossman@hs-law.com

                      *Attorneys for Plaintiff Matthew Connolly*